**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JUANITA NELSON

          Plaintiff

    v

RONNIE HINMAN, et al.

          Defendants

:

:

:              Civil Case No. L-10-1816

:

:

:

o0o

**<u>MEMORANDUM</u>**

Now pending is the Motion of Defendants, the Crisfield Volunteer Fire Department ("Fire Department" or "Department") and Ronnie Hinman, Larry Tyler, and Charles Cavanaugh (collectively, "Individual Defendants") for Summary Judgment.  Docket No. 28.  The Court has carefully reviewed the papers and, on August 5, 2011, held a hearing on the matter.  Because there is insufficient evidence from which a reasonable jury could conclude that the Plaintiff was denied membership in the Fire Department because of her gender, the Court will, by separate Order, GRANT the Motion.

**I.      BACKGROUND**

This case arises out of the refusal of the Volunteer Fire Department of Crisfield, Maryland to extend membership to the Plaintiff, Juanita Nelson, allegedly because of her gender. The facts of the case, viewed in the light most favorable to Nelson, are as follows:

The Fire Department, similar to a social club, has an almost entirely subjective and standardless application process.  Apart from a requirement that all members be 18 years old and

live in the district served by the Fire Department, there are no objective selection criteria.  New members are admitted to the Fire Department by vote of all current members who attend the meeting during which an application is considered.  Each member gets a single, secret vote, and applicants must receive two thirds of the votes cast.  Nelson, who was indisputably well qualified for the position, applied on three separate occasions: February 18, 2008, June 2, 2008, and January 7, 2009.  She was rejected each time, on the second occasion by a scant two votes (21 for / 13 against).  The first and third votes were not close (15 for / 19 against, and 11 for / 21 against, respectively).

Applications are not accepted continuously.  Rather, based on its resources and hiring needs, the Fire Department periodically opens and closes its membership.  During the closed periods, it does not keep previously submitted applications on file.  Moreover, the Fire Department does not publicly announce open periods.  Aspirants must check back regularly with the Chief to determine whether applications are being accepted.[1]

Nelson's third application was considered and rejected on January 7, 2009.  Thereafter, sometime between March 16, 2009 and May 4, 2009, the Department stopped accepting applications.  While there is no record of the decision to close the rolls, the minutes of the May 4, 2009 meeting reflect that a vote was taken, and that it was resolved to "keep" membership closed "for financial reasons."  Nelson's Amended Complaint alleged that "several months" after her third application was denied, she asked Chef Reynolds for a fourth, whereupon Reynolds informed her that the Fire Department was not accepting new recruits owing to a lack of "turn-out gear."  Nelson then wrote a letter to the Department, dated May 5, 2009, asking that her application be reconsidered and advising that if the reason for the closure was the cost of "turn-

---

[1]    The chief is the only member of the Fire Department who is authorized to hand out an application.

out gear," she would provide her own.  Nelson's letter was read aloud at the May 18, 2009

meeting, but no action was taken on her request.

At some unknown date or dates after May 18, 2009, membership was reopened.  The Fire

Department voted in two male applicants on October 19, 2009 and a third male applicant on

November 2, 2009.  After November 2, 2009, the membership remained closed until March of

2011, a period of roughly a year and a half.[2]

Before the instant suit was filed on July 6, 2010, the Fire Department, in its 135-year

history, had never admitted a woman.  Apart from Nelson, however, only three other women

have ever completed applications.  In March of 2011, the Fire Department voted to make Nicki

Powell its first female member.

Nelson brought suit against the City of Crisfield ("City"), the Fire Department, and three

individual members of the Fire Department: Ronnie Hinman, Larry Tyler, and Charles

Cavanaugh.  The Amended Complaint contains four counts:

- Count I - 42 U.S.C. § 1983 Due Process and Equal Protection
- Count II - 42 U.S.C. § 1985(3) Conspiracy
- Count III - Civil Conspiracy (Maryland common law)
- Count IV - Intentional Infliction of Emotional Distress ("IIED")

On November 5, 2010, the Court granted in part and denied in part the Defendants'

Motion to Dismiss.  The Court dismissed all claims against the City, and dismissed the § 1985(3)

and state-law conspiracy claims against the Fire Department and the Individual Defendants.  See

Mem Op., Docket No. 17.  The parties then engaged in extensive discovery, deposing most

---

[2]     Because the Fire Department did not keep records, the period or periods between May 18
and November 2, 2009 when the department was accepting applications are unknown.  There is
no evidence, however, that Chief Reynolds ever misinformed Nelson about open periods or
refused to provide her with an application when the department was accepting them.  Nor does
Nelson allege that she asked to be notified when membership reopened.

members of the Fire Department as well as several third parties.  The Defendants now move for

summary judgment on Nelson's remaining § 1983 and IIED claims.


II.      **STANDARD OF REVIEW**

The Court may grant summary judgment when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986); <u>see</u> <u>also</u>

<u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial

judges have "an affirmative obligation" to prevent factually unsupported claims and defenses

from proceeding to trial).  Nevertheless, in determining whether there is a genuine issue of

material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in

the light most favorable to the non-moving party.  <u>Pulliam Inv. Co. v. Cameo Properties</u>, 810

F.2d 1282, 1286 (4th Cir. 1987).  When considering a motion for summary judgment, the Court

must apply the Federal Rules of Evidence.  Inadmissible hearsay and conclusory statements with

no evidentiary basis are incompetent to support or defeat a motion for summary judgment.  <u>See</u>

<u>Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro</u>, 64 F.3d 962, 967 (4th

Cir. 1995).

III.     ANALYSIS

a.   42 U.S.C. § 1983 Due Process and Equal Protection Violations (Count I)

Nelson urges that the Fire Department and the Individual Defendants violated her

Fourteenth Amendment rights by refusing to admit her on the basis of her gender.[3]  "The equal

protection clause confers on a public employee [or an applicant for public employment] a federal

constitutional right to be free from gender discrimination."  Beardsley v. Webb, 30 F.3d 524, 530

(4th Cir. 1994).

Employment discrimination claims brought against a state actor pursuant to § 1983 are

generally analyzed under the same standards used to evaluate Title VII claims.  See Gairola v.

Va. Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985).  A plaintiff may defeat summary

judgment by either of two avenues of proof: (a) direct evidence that gender motivated the

decision not to hire her, or (b) the familiar burden-shifting framework of McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973).  Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d

277, 284–85 (4th Cir. 2004) (en banc); see also Gairola v. Va. Dept. of Gen. Serv., 753 F.2d

1281, 1285 (4th Cir. 1985).

Gender discrimination is, by definition, intentional.  "Regardless of the type of evidence

offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence

---

[3]        Section 1983 provides that "[e]very person who, under color of any statute, ordinance,
regulations, custom, or usage, of any State or Territory or the District of Columbia, subjects, or
causes to be subjected, any citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and
laws, shall be liable to the party injured in an action at law, suit in equity, or other proper
proceeding for redress." 42 U.S.C. § 1983.
        While employment discrimination suits arising under § 1983 usually involve a refusal to
hire the plaintiff, members of the Fire Department are not "hired" in the traditional sense.  They
are volunteers who receive no compensation other than free city water service and a small state
income tax deduction.  Nevertheless, in considering this case, the Court will use, as most apt, a
"refusal to hire" analytical framework as outlined infra.

of pretext), or whether she proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.' " Hill, 354 F.3d at 286 (quoting  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 153 (2000)).  The plaintiff must demonstrate such an intent by showing that the protected trait motivated the employer's decision and had a determinative influence on the outcome.  Id.

Though discrimination claims brought under § 1983 are generally analyzed under the Title VII framework, there is a difference with regard to the applicable burden of proof in mixed-motive cases.  The Civil Rights Act of 1991 amended Title VII to provide that a plaintiff need only show that illicit discriminatory animus was one motivating factor in the employer's decision.  See 42 U.S.C. § 2000e-2(m).  Because § 1983 lacks this statutory language, however, a state employer sued under that provision can avoid liability if it can prove that it would have made the same employment decision absent the prohibited consideration.[4]  See Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Pennington v. City of Huntsville, 261 F.3d 1262, 1269 (11th Cir. 2001).

The question, therefore, is whether discriminatory animus on the part of those who voted on Nelson's application was a but-for cause of her rejection.  In order to test the sufficiency of the evidence, the Court has thoroughly reviewed the entire record, including the deposition transcripts.  The evidence falls into two categories: direct and circumstantial.  The direct evidence takes the form of statements attributed to members of the Fire Department regarding their feelings about female applicants.  The circumstantial evidence focuses on events and

---

[4]      In this way, after a plaintiff establishes a likelihood that the defendant considered an impermissible factor, the burden then shifts to the defendant to show that this consideration made no difference in the end.

circumstances tending to show that the Fire Department had an anti-female bias.  The Court will

consider each category of evidence in turn.


### i.  Direct Evidence

Direct evidence of discrimination in the arena of employment discrimination is "evidence

of conduct or statements that both reflect directly on the alleged discriminatory attitude and that

bear directly on the contested employment decision."  Taylor v. Va. Union Univ., 193 F.3d 219,

232 (4th Cir. 1999) (abrogated on other grounds).

Nelson's direct evidence consists of several discriminatory remarks allegedly made by

Fire Department members.  Nelson did not hear these remarks herself; rather, she asserts that the

remarks were related to her by others.  With a single exception, both the declarants and the

relators deny either making the statements or passing them on to Nelson.

The only undisputed evidence probative of discriminatory intent is a comment made by

one member of the Fire Department, Doug Lewis, during a conversation with two other

members, Charles Cavanaugh and George Morgan.  Both Cavanaugh and Morgan testified that

Lewis, at some point before Nelson applied to the Fire Department, asserted that "there ain't

going to be no bitches in the fire company" or "no bitches on the fire truck."  Cavanaugh Dep.

22:12–13; Morgan Dep. 24:4–5.  As to timing, Morgan testified that Lewis made the remark

"way before Juanita [Nelson] ever got in the fire company," which the Court takes to mean

before she submitted her first application.  Id. at 22:2–3.  Cavanaugh testified that Lewis made

the remark "one night."  Cavanaugh Dep. 22:10.  Although Lewis was deposed, he was not asked

about the statement during his deposition.

Lewis's remark certainly evidences discriminatory animus towards female aspirants to Fire Department membership. Lewis also testified that he voted against Nelson during the first vote on February 18, 2008. There is, however, a backstory to the relationship between Lewis and Nelson that makes these facts unhelpful to Nelson's case. Lewis and Nelson clashed personally when they were both members of the Lower Somerset Ambulance and Rescue Squad ("Rescue Squad"). They reconciled, however, and Lewis voted in favor of Nelson's second application. Lewis Dep. 8–9. Before casting his ballot on the second application, Lewis publicly announced to the membership that he was voting in favor of Nelson. Id. at 13:19–20. On Nelson's third attempt, Lewis formally sponsored her application.[5]

In addition to Lewis's statement that there would be "no bitches on the fire truck," Nelson claims that several other comments derogatory towards women were related to her. Because these statements are of such importance to the case, the Court will analyze them seriatim.

- Nelson states that Chief Reynolds told her, after her second application had been denied, that there were certain members who did not want women in the department, specifically identifying Ronnie Hinman and Charles Cavanaugh. Nelson Dep. 28, 85–86. Chief Reynolds admits advising Nelson that Hinman and Cavanaugh were against her, but denies telling Nelson that their opposition was motivated by her gender. Reynolds Dep. 8–9. Hinman and Cavanaugh flatly deny making any of the remarks attributed to them. Hinman Dep. 41–42, 44; Cavanaugh Dep. 67.

- Nelson claims that after the negative vote on her second application, Tim Collins advised her that "Pork Chop [Hinman] made it clear that they didn't want any females in there."

---

[5]     All applicants are required to secure the sponsorship of two current members before an application will be submitted for a vote.

Nelson Dep. 18:11–12.   Collins testified that he never had any conversation with Hinman regarding Nelson's applications, that he never heard any member of the Fire Department express an objection to the admission of women, and that he never made any statement to that effect to Nelson.  Collins Dep. 12–15.

- Nelson also contends that Lewis informed her of two discriminatory comments made by firemen around the time of the vote on her third application.  Before the vote, Larry Tyler is alleged to have warned the members that, "if we let a female in here, it will never be the same again."  Id. at 70:2–3.  Tyler is deceased, and none of the members who were deposed recall his alleged statement.

- Nelson also claims that, after the vote, Lewis advised her of comments made by Hinman and Cavanaugh to the effect that they did not want her, or any female, in the Fire Department.  Id. at 12–13.  Lewis denies that any of the alleged comments were made or that he related them to Nelson.  Lewis Dep. 17–20.

The admissibility of these alleged statements is an important threshold issue.  Without them, Nelson's direct evidence of bias is negligible, consisting almost entirely of the single comment Lewis made before he became Nelson's advocate.   The Defendants argue that the statements, even if made, are inadmissible hearsay and, thus, may not be considered by the Court at summary judgment.  Greensboro Prof'l Fire Fighters Ass'n, 64 F.3d at 967.  Nelson responds that these statements, as admissions of a party opponent, fall within Federal Rule of Evidence 801(d)(2) (definition of non-hearsay).

Nelson has no direct proof that the statements were made.  The statements were neither recorded nor otherwise memorialized.  The alleged declarants and relators deny making, hearing, or repeating the statements.  Nelson's sole proof is her own testimony regarding her

conversations with the alleged relators.  This means that Nelson relies on the out-of-court

declarations of Collins, Lewis, and Reynolds to prove that others (Hinman, Cavanaugh, and

Tyler) made the statements attributed to them.  Each alleged statement, therefore, involves two

levels of hearsay: the statement itself, and its alleged repetition.  For Nelson's testimony to be

admissible under the Federal Rules of Evidence, both levels must fit within an exception to the

hearsay rules.

Rule 801(d)(2)(A) provides in pertinent part that "a statement is not hearsay if [it] is

offered against a party and is the party's own statement."  Tyler is now deceased.  The record

reveals that he attended only the meeting at which Nelson's third application was considered,

and that he did not cast a vote.  Nelson conceded at oral argument that there was no further basis

for maintaining suit against Tyler, meaning that he should not be considered a party opponent.

Hinman and Cavanaugh, however, are both named party opponents, meaning that their own

statements, if offered against them, are not hearsay pursuant to Rule 801(d)(2).

The main bar to admissibility lies in the second level of hearsay, the relation of the

alleged statements to Nelson.  None of the relators (Collins, Lewis, and Reynolds) is a party

opponent.  Nelson would overcome this obstacle by invoking another section of FRE 801.  Part

(d)(2)(D) excepts a statement from the definition of hearsay if it is "a statement by the party's

agent . . . concerning a matter within the scope of agency . . . made during the existence of the

relationship."

The parties dispute whether the voting members are agents of the Department with

respect to its admissions policies.  The Court concludes that Nelson has the better part of the

argument.[6]  Because the Fire Department is a Defendant, the statements of its voting members

are admissible against it.  This evidentiary ruling is a Pyrrhic victory for Nelson, however,

because summary judgment must be granted in favor of the Fire Department, making it a non-

party.

There is no respondeat superior liability under § 1983.  An entity, be it a municipality or

a fire department, can be held liable for the discriminatory acts of its employees or members only

if the discrimination was part of an institutional pattern, practice, or custom.  Monell v. Dep't of

Social Services, 436 U.S. 658, 692 (1978).  As is more fully explained in section III(a)(iii) of this

Opinion, there is insufficient evidence in the record from which Monell liability could be

imposed on the Fire Department.  As articulated in the case law, a pattern, practice, or custom

exists only when the evidence shows a widespread usage of a particular unconstitutional method

of which policymakers had actual or constructive knowledge.  See Randall v. Prince George's

Cnty., 302 F.3d 188, 210 (4th Cir. 2002).  Such evidence is lacking.  Only four women have ever

applied to the Fire Department, one of whom was accepted.  Nelson, herself fell only two votes

short on her second application.  She might successfully sue members who voted against her

---

[6]      The Defendants assert that because none of the members in question was responsible for
hiring and firing (in this case, the relevant "matter within the scope of the agency") none can be
considered the Fire Department's agent.  This argument is misplaced.

In order to establish agency, the declarant must have "[s]ignificant involvement, either as
advisor or other participant," in the challenged employment decision.  EEOC v. Watergate at
Landmark Condominium, 24 F.3d 635, 640 (4th Cir. 1994).  In essence, the Defendants urge that
no member had "significant involvement" in the decision to accept or reject Nelson's application
because each had only a single vote out of around 30 cast.  This argument leads, of course, to the
untenable conclusion that no member of the Fire Department would properly be its agent in
election matters.  Each member would be absolved of any accountability for the ultimate
decision by virtue of the fact that hiring authority is exercised democratically rather than by
managerial fiat.  Under the Fire Department's voting rules each voting member is a participant,
and each member's involvement is as significant as anyone else's.  Each voting member is,
therefore, the Fire Department's agent, at least with regard to statements relating to votes.  Thus,
Nelson's analysis is the correct one.

based on gender bias, but the evidentiary basis is lacking to impose liability on the Department itself.

In order for the comments to qualify as non-hearsay under Federal Rule of Evidence 801(d)(2)(D), the people who related them to Nelson must be Defendants or the agents of a Defendant.  The relators, Collins, Lewis, and Reynolds, are neither Defendants nor agents of Hinman and Cavanaugh.  Because the Fire Department will no longer be a Defendant, FRE 801(d)(2)(D) does not remove the hearsay bar that prohibits the receipt of the relators' alleged statements into evidence.  On summary judgment, the Court is permitted to consider only admissible evidence, meaning that the comments allegedly related to Nelson must be excluded from the analysis.  Because of this, Nelson's admissible direct evidence of discrimination is insufficient to withstand a summary judgment motion.

### ii.  Circumstantial Evidence

Absent sufficient admissible direct evidence of discrimination, Nelson must proceed under the burden-shifting framework set forth in McDonnell Douglas.  In order to establish a prima facie case of gender discrimination, the plaintiff must establish that: (1) she is a member of a protected class; (2) she applied for the position in question; (3) she was qualified for that position; and (4) the defendant rejected her application under circumstances that give rise to an inference of unlawful discrimination. Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 544–45 (4th Cir. 2003); Brown v. McLean, 159 F.3d 898, 902 (4th Cir. 1998).  It is undisputed that Nelson satisfies the first three elements, and the Court determines that she satisfies the fourth as well.

Nelson relies on several factors to support the drawing of an inference of discrimination. First, she was rejected although well qualified and arguably better qualified than several male

applicants who were admitted.  Second, the application process involves no meaningful objective

selection criteria.  Third, the Fire Department refused to reconsider her application after she

made it clear that, if the membership rolls were closed because of the cost of turn-out gear, she

would bear this cost herself.  Fourth, the Department failed to publicly announce when

applications were opened and closed, and admitted two male applicants less than a year after

Nelson had been told that the rolls were closed.  While the Court offers no opinion as to whether

any one of the above would be sufficient standing alone, taken together they would warrant a

reasonable observer in drawing an inference of discrimination.

  If the plaintiff establishes a prima facie case of discrimination, the employer may rebut

the plaintiff's case by articulating a legitimate, nondiscriminatory reason for its decision.

Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1129 (4th Cir. 1995).  The plaintiff

must then establish that the employer's articulated reason is mere pretext, and that, in fact, the

employer intentionally discriminated against her because of her gender.  See McDonnell

Douglas, 411 U.S. at 804; Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 269

(4th Cir. 2005).

  Because of the nature of the application process, the Fire Department itself does not have

a single, cohesive reason for refusing to accept Nelson.  Rather, its reason is the aggregation of

the reasons of its voting members.  When asked why they voted against her, some of the

members who did so stated that they simply did not care for Nelson personally.  Others testified

that Nelson was known as an individual who created controversy wherever she went.  A number

of Fire Department members also volunteered, or knew others who volunteered, at the Lower

Somerset Ambulance and Rescue Squad, to which Nelson belonged.  They variously testified

that she had a reputation for "get[ting] very angry very quickly," "backstabbing," and being "a pot-stirrer." Lewis Dep. 9; Morgan Dep. 16; George Nelson Dep. 14–15.

Members cited incidents in which Nelson had created ill will by soliciting votes to reject applicants to the Rescue Squad or pressing complaints about matters that they considered trivial.[7] In one much-discussed incident, Nelson proposed to oust Cavanaugh, who had been captain of the Rescue Squad for eight years. In sum, a number of members asserted that they voted against Nelson because she had a reputation for generating friction and controversy.

Without the discriminatory statements allegedly made by Hinman and Cavanaugh, Nelson has little to rebut this explanation.[8] Lewis's statement is uncontested, but it is immaterial because Lewis supported Nelson during the close second vote, and there is no evidence that his earlier opposition influenced the vote of any other member.

The factor weighing most heavily in Nelson's favor is the nature of the selection process itself. Most employers today have formal hiring plans that include written position descriptions, job qualifications, and evaluation criteria. They post openings, interview candidates, and record the reasons for rejection or acceptance.

The Fire Department, by contrast, has an almost entirely standardless and subjective application process, coupled with a secret voting procedure. Membership opens and closes at unpredictable, poorly documented times, which are not posted in any official manner, but rather are communicated to aspirants informally, if at all.

---

[7]     For example, George Nelson, the Plaintiff's brother-in-law, testified that she texted him at 7:30 a.m. on his day off to complain that she had seen the teenage daughter of Chief William Reynolds wearing an official Squad 8 sweatshirt when the daughter was not herself a Squad 8 member. George Nelson Dep. 21–23.

[8]     Nelson originally alleged that Hinman and Cavanaugh had also solicited older members who did not normally attend meetings to show up and vote against her. Am. Compl. ¶¶ 10, 19, 33. There is no evidence in the record to support the contention, however, and Nelson appears to have abandoned it.

When an aspirant is permitted to submit an application, the membership's consideration of that application is guided by nothing more than the individual voting members' subjective motivations which, along with the votes themselves, usually remain secret.  This process is a matter of concern, because it carries the potential to mask the perpetuation of discriminatory standards.  Such a state of affairs effectively increases the burden on a plaintiff, such as Nelson, to uncover evidence of discriminatory intent.

A purely subjective decisionmaking process, however, is not in and of itself impermissible and, without more, does not give rise to an inference of discrimination.  See, e.g., Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 559–60 (4th Cir. 2011).  In Adams, an associate professor who identified himself as the only Christian conservative in his department brought an action against the University of North Carolina, alleging religious discrimination in the school's decision not to promote him to a full professorship.  Adams contended that he was denied tenure because of his deep religiosity and because his conservative politics were out of step with the overwhelmingly liberal faculty.  Like Nelson, he also claimed that he was well qualified, meaning that he must have been rejected because of his religious and political views.

The Fourth Circuit determined that Adams's attempt to compare his qualifications with those of others who had been granted tenure "ignores 'the inevitable element of subjectivity' involved in promotion decisions in the university setting," subjectivity which "is permitted so long as it lacks discriminatory intent."  Id. at 559 (quoting Smith v. Univ. of North Carolina, 632 F.2d 316, 342 (4th Cir. 1980)).

Thus, "[w]hile more formalized procedures may have been desirable," Smith, 632 F.2d at 343, the Fire Department may, nevertheless, use such a system so long as it does not make its

decisions for legally impermissible reasons.[9]  Accordingly, Nelson must rebut the

nondiscriminatory reason (that her controversial character prompted members to vote against

her) with sufficient evidence from which a jury could find that the asserted reason was a mere

smokescreen for the employer's true motive.  Weak evidence concerning Nelson's reputation for

spreading discord might combine with a formless hiring system to satisfy this burden.  The

Department's evidence is substantial, however, meaning that the standardless system, while

regrettable, cannot carry the day by itself.

As regards the lack of public notice of when membership opened and closed, there is

nothing in the record to suggest that the Department affirmatively closed applications in order to

keep Nelson out, or, if they had, that her gender would have been their reason for doing so.

Several members testified that it was normal for membership to close from time to time.

Moreover, although applications were eventually closed for a long stretch, Nelson was given full

consideration, including an up-or-down vote, on three separate occasions prior to the closure.

Additionally, while the Fire Department had never accepted a female prior to Nelson's

applications, the limited number of female applicants saps this fact of probative force.[10]  When

considered in the context of the Fire Department's 135-year existence, three rejections cannot

constitute statistically significant evidence that its hiring policy, which is facially neutral, has a

disparate impact on female applicants.  See Watson v. Fort Worth Bank and Trust, 487 U.S. 977,

---

[9]     The Fire Department's bylaws explicitly prohibit discrimination based on gender, race, or other protected characteristic.  The Department would be well advised to go a step further by adopting membership qualifications tailored to firefighting ability and by giving public notice of open admissions periods.

[10]     As mentioned, aside from Nelson, only three other women completed applications.  One of those women, Nicki Powell, was accepted.  Because Powell applied after Nelson's suit was filed, her acceptance does not speak to the conditions that obtained when Nelson applied.  Nevertheless, Powell's admittance undercuts any argument that the culture of the Fire Department is inalterably anti-female.

995 (1988) ("[S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation."). The Watson Court specifically noted that weaknesses such as "small or incomplete data sets" will render statistical evidence of little probative value. Id. at 996–97.[11]

### iii.  Liability of the Crisfield Fire Department

In addition to Hinman and Cavanaugh, Nelson names the Crisfield Fire Department, a municipal corporation, in its own right. Municipal entitles may be liable under § 1983, but not on the basis of respondeat superior. Monell, 436 U.S. at 692. The entity may only be held liable when the deprivation of right occurred pursuant to a municipal policy, practice, or decision of a final municipal policymaker. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.

Even viewing the facts in the light most favorable to Nelson and taking the alleged statements by Hinman, Cavanaugh, and Tyler into account, any gender bias would have been limited to a few individuals within the Department. Nelson has adduced no evidence from which a reasonable finder of fact could conclude that the Fire Department as an organization has (or had) a practice of maintaining an all-male force. The subjective standards discussed above, while they might aid the Fire Department in masking an unofficial policy of rejecting women, are not proof that it actually did so. The Court recognizes that Nelson, despite her eventual rejection, had strong support within the Department: several members actively sponsored her candidacy, and, when Nelson's applications were considered, she received 15, 21, and 11

---

[11]      The Court also notes that, at each meeting when Nelson's applications were considered, several male aspirants were also rejected. Many current members, including Chief Reynolds, testified that they had to apply multiple times before finally winning acceptance. See Reynolds Dep. 42–43; Snead Dep. 8, 12–13; Hunt Dep. 7; see also Nelson Dep. 27, 35.

favorable votes out of approximately 30 votes cast.  The Fire Department is, therefore, entitled to summary judgment on Nelson's § 1983 gender discrimination claims.

### iv.   Liability of Tyler, Hinman and Cavanaugh

Larry Tyler is deceased, and Nelson has agreed that there is no continued basis for maintaining suit against him.  This leaves Ronnie Hinman and Charles Cavanaugh as Individual Defendants.  As discussed above, because the Fire Department is entitled to judgment as a matter of law, Hinman and Cavanaugh's alleged statements are inadmissible hearsay and may not be used to support Nelson's contention that they voted against her on the basis of her gender.  Absent these statements, and absent any other evidence sufficient to support an inference of widespread discriminatory practice, no reasonable jury could conclude on the record now before the Court that the reasons offered by Hinman, Cavanaugh, or any other members for voting against Nelson's applications were pretextual and that her gender was the true cause for her rejection.  As such, the Individual Defendants are entitled to summary judgment on Nelson's § 1983 claim as well.

### b.   Intentional Infliction of Emotional Distress

Finally, in addition to her gender discrimination claims, Nelson's Complaint also alleges intentional infliction of emotional distress ("IIED").  In order to establish a claim for IIED in Maryland, four elements must be established: (1) the conduct must be intentional or reckless, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, (4) the emotional distress must be severe.  Penhollow v. Cecil Cnty., 695 A.2d 1268, 1285 (Md. Ct. Spec. App. 1997).  The "extreme and outrageous" prong is extraordinarily difficult to satisfy.  Id. at 1285–86.  Even conduct that is tortious, criminal, intended to inflict emotional distress, or that has been found so malicious as to

justify an award of punitive damages is not necessarily sufficient to establish a claim for IIED. Batson v. Shiflett, 325 Md. 684, 735 (1992).

Nelson's IIED claim was not resolved at the motion-to-dismiss stage because the Defendants did not challenge it at that time.  Nelson's sole argument in favor of this count on summary judgment is that the Defendants discriminated against her because of her gender, and that "[a]lthough conduct of this nature may not have been considered 'extreme and outrageous' a century ago, it is (or should be) today."  Pl.'s Opp. 24.

Even if some members of the Fire Department did vote against Nelson solely because she is a woman, such behavior falls far short of the requirements for IIED liability under Maryland law.  In essence, Nelson would have the Court find that every violation of § 1983 or Title VII stemming from gender discrimination is also an intentional tort heretofore reserved for conduct "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Harris v. Jones, 281 Md. 560, 567 (1977).  The Court declines to take such a step.  The Defendants are entitled to summary judgment on Nelson's IIED claim.

I.    CONCLUSION

For the foregoing reasons the Court will, by separate Order of even date, GRANT Defendants' Motion for Summary Judgment.

Dated this 6th day of February, 2012.

/s/
_____
Benson Everett Legg

United States District Judge